[836 NYS2d 4]

GRYPHON DOMESTIC VI, LLC, et al., Appellants-Respondents, et al., Plaintiff, v APP INTERNATIONAL FINANCE COMPANY, B.V., et al., Defendants, and INDAH KIAT INTERNATIONAL FINANCE COMPANY B.V. et al., Respondents-Appellants. GRYPHON DOMESTIC VI, LLC, et al., Appellants, et al., Plaintiff, v APP INTERNATIONAL FINANCE COMPANY, B.V., et al., Defendants, and INDAH KIAT INTERNATIONAL FINANCE COMPANY B.V. et al., Respondents.

First Department, April 17, 2007

**APPEARANCES OF COUNSEL**

*Siller Wilk LLP*, New York City (*Helen A. Rella* and *Jay S. Auslander* of counsel), for appellants-respondents/appellants.

*Schnader Harrison Segal & Lewis LLP*, New York City (*Kenneth R. Puhala* and *Benjamin P. Deutsch* of counsel), for respondents-appellants/respondents.

**OPINION OF THE COURT**

CATTERSON, J.

In June 1994, the defendant Indah Kiat International Finance Company B.V. (hereinafter referred to as Indah Kiat International or the issuer), a Dutch corporation, issued $200 million of 11⁷/₈% guaranteed secured notes due in 2002 (hereinafter referred to as the notes). The defendant P.T. Indah Kiat Pulp & Paper Corporation (hereinafter referred to as P.T. Indah Kiat or the guarantor), an Indonesian corporation, guaranteed payment. The notes were secured by collateral located in Indonesia.

It is uncontested that the notes, and the indenture pursuant to which they were issued, are governed by New York law. The defendants submitted to the nonexclusive jurisdiction of the state and federal courts located in New York City. They also appointed CT Corporation as their agent for service of process:

> "As long as any of the Notes remain outstanding, each of the Issuer and the Guarantor will at all times have an authorized agent in New York City, upon whom process may be served . . . Service of process upon such agent and written notice of such service mailed or delivered to the Issuer or the Guarantor . . . shall to the fullest extent permitted by law be deemed in every respect effective service of process upon the Issuer or the effective service of process upon the Issuer or the Guarantor . . . Each of the Issuer and the Guarantor hereby irrevocably appoints CT Corporation as its agent for such purpose . . . Notwithstanding the foregoing, the Issuer or the Guarantor may, with prior written notice to the Trustee, terminate the appointment of CT Corporation and appoint another agent for the above purposes so that the Issuer and the Guarantor shall at all times have an agent for the above purposes in New York City."

In March 2001, Indah Kiat International stopped paying on the notes. Despite due demand, P.T. Indah Kiat, the guarantor, made no payment on the notes. After defaulting, the defendants (and the other members of the corporate family to which the defendants belong) engaged in negotiations with their creditors.

At some point before March 11, 2003, the date of the amended complaint, the plaintiffs—whom this Court had previously described as "institutional traders in distressed debt commonly known as 'vulture funds' "—purchased some of the notes.[1] On October 20, 2003, the IAS court granted the plaintiffs summary judgment on their notes. This Court affirmed in relevant part. (*Gryphon Dom. VI, LLC v APP Intl. Fin. Co., B.V.*, 18 AD3d 286 [2005].)

On November 13, 2003, evidently cognizant of the benefits of playing on one's homefield, P.T. Indah Kiat sued the plaintiffs in Indonesia, seeking, inter alia, annulment of the notes and the indenture and an injunction that would prevent the plaintiffs (now the defendants in the Indonesian action) from enforcing or collecting on the notes or indenture. To no one's surprise, the Indonesian court issued the requested injunction.

In June 2004, the plaintiffs, undeterred by the rulings of the Indonesian court, served a restraining notice on each defendant. Each notice stated:

> "to the extent you are in possession or in custody of property in which any or all of the judgment debtors . . . have an interest . . . **YOU ARE FORBIDDEN** to make or suffer any sale, assignment or transfer of, or interfere with, any such property or pay over or otherwise dispose of any such debt except as therein provided."

In September 2004, the plaintiffs moved for a turnover order. The defendants' counsel negotiated a briefing schedule and the plaintiffs thereafter served an amended turnover motion on the defendants' counsel. The only substantive difference between the two motions for a turnover order was that the amended motion asked that personal property other than cash be turned over to the sheriff of New York County rather than to the plaintiffs' counsel.

The plaintiffs first requested that the defendants pay the judgment from the property covered by the restraining notices. If that did not yield enough money to satisfy the judgment, the plaintiffs asked that the following items (among others) be turned over: all cash held in certain specified banks; all interests and holdings in certain specified finance and trading subsidiaries; certain paper, packaging and pulp mills located in Indonesia;

---

1. *Gryphon Dom. VI, LLC v APP Intl. Fin. Co., B.V.*, 28 AD3d 322, 323 (2006).

and "all real and tangible property securing the notes." The plaintiffs submitted documents showing that the defendants owned the above assets.

Additionally, the plaintiffs made the following demand:

> "To the extent the Judgment Debtors do not possess, have custody of or control the possession or custody of any stock or other certificates or instruments evidencing their ownership in any subsidiaries or other entities, we ask the Court to issue an order that itself will serve as an assignment . . . to the Judgment Creditors, of each Judgment Debtor's right, title and interest, in any such subsidiary or other entity in which such Judgment Debtor has an interest, and directing that the secretary or other custodian of each such subsidiary's or other entity's stock books and records, record such transfer to the Judgment Creditors on the stock books and records of such subsidiary or other entity."

The defendants opposed the plaintiffs' motion and cross-moved to vacate the June 2004 restraining notices, contesting service. The defendants also asserted that "a restraint on Indah Kiat's . . . ability to make any payments or transfers of property anywhere in the world . . . would shut down APP's business operations on a global scale." APP is the parent company of both defendants. The defendants did not deny owning any of the assets listed by the plaintiffs.

Citing *ABKCO Indus. v Apple Films* (39 NY2d 670, 674-675 [1976]) and *Matter of National Union Fire Ins. Co. of Pittsburgh, Pa. v Advanced Empl. Concepts* (269 AD2d 101 [2000]), the court below vacated the restraining notices because the defendants' "property is located outside of New York, and restraining notices issued by the Court do not reach property in other jurisdictions."

But the court rejected the defendants' argument that it could not compel them to turn over property located outside of New York. The court also rejected the defendants' argument that the plaintiffs "never properly served them with notice of the turnover motion."

The court described all of the plaintiffs' attempts at service on the defendants and then held that,

> "At least one of those methods constituted good service on the Judgment Debtors, namely mailing the

notice of motion by certified mail, return receipt requested, in October 2004 to CT Corp., while mailing a copy to the Judgment Debtors at their business addresses. The Judgment Debtors were contractually obligated to accept service by that method."

The court rejected the defendants' argument that they had discharged CT Corp. in September 2002, reasoning: "the Judgment Debtors breached their obligations under the indenture by failing to inform its trustee in advance that they were discharging CT Corp., and by failing to immediately name a replacement agent. As a result, the appointment of CT Corp. remained irrevocable under the Indenture."

The court then refused to order the defendants to turn over their bank accounts, holding that, "To reach the bank deposits, the Judgment Creditors would have to bring a special proceeding under CPLR 5225 (b) naming the banks as respondents."

The court also refused to order the defendants to turn over mills and other real property, "inasmuch as delivery orders under CPLR 5225 can only apply to money or personal property."

However, the court did find some property that could be turned over:

"the Judgment Creditors have made a *prima facie* showing that P.T. Indah Kiat . . . possesses stock certificates for a number of [its] subsidiaries and affiliates. As evidence, the Judgment Creditors submit (1) a corporate organization chart produced by a non-party in response to an information subpoena and (2) consolidated financial statements and SEC registration statements. The Judgment Debtors wrongly claim that the Judgment Creditors' evidence is inadequate, but they never deny that P.T. Indah Kiat . . . owns the stock certificates."

The court rejected the defendants' argument that a turnover order would jeopardize their restructuring, stating, "the Judgment Debtors offer no explanation why an order directing them to satisfy the judgment in this action would disrupt their restructuring of different indebtedness to other creditors."

The court also rejected the defendants' argument that a turnover order would conflict with the anti-suit injunctions issued by the Indonesian courts, stating, "an order by a foreign court that enjoins and restrains the parties in proceedings in that

court does not affect the courts of this state and their proceedings." However, the court stayed the turnover order "insofar as it pertains" to property currently in Indonesia because it believed that the defendants could satisfy the judgment "by delivering assets located outside of Indonesia." In furtherance of its order, the court enjoined the defendants "from transferring their assets into Indonesia . . . until the Judgment is satisfied."

The defendants then moved to vacate the injunction prohibiting them from transferring assets into Indonesia, arguing that the court had issued it sua sponte and without notice. The court vacated the injunction because "the plaintiffs did not apply for this broad injunctive relief," and "New York courts cannot restrain transfers of property located outside of the state." On May 4, 2006, this Court stayed the IAS court's vacatur of its injunction.

All plaintiffs except Warner Mansion Fund now appeal the motion court's orders. The defendants cross-appeal the 2005 order to the extent it found that the plaintiffs had properly served them with the turnover motion and ordered them to turn over stock certificates located outside Indonesia.

■ The defendants contend, and the motion court agreed, that a turnover order pursuant to CPLR 5225 (a) cannot reach property outside New York. This was error. In *Miller v Doniger* (28 AD3d 405 [2006]) and *Starbare II Partners v Sloan* (216 AD2d 238, 239 [1995]), this Court squarely held that the defendant judgment debtors could be ordered to turn over out-of-state assets to a New York sheriff.

The defendants contend that *Miller* and *Starbare* should be limited to situations where a judgment debtor removes property from New York. However, those cases did not hinge on removal of property from the jurisdiction. Rather, the explicit rationale was that the court could order the defendant judgment debtor to turn over property because it had personal jurisdiction over the defendant. (*Starbare*, 216 AD2d at 239.)

The defendants' citations to cases involving attachment are inapposite. Clearly, it would violate the sovereignty of another state if a New York sheriff tried to attach property in another state. However, a turnover order merely directs a defendant, over whom the New York court has jurisdiction, to bring its own property into New York. We find no reason why such an order would offend another state's sovereignty, unless the other state has ordered the defendant not to move its property *from* that state, which problem will be considered below.

The defendants pose all manner of hypothetical conflicts between New York law and other states' laws if a turnover order can compel a debtor to surrender non-New York property. However, any such conflict would be solely of the defendant judgment debtors' own making: a defendant simply could avoid any conflict by not subjecting himself or herself to New York's jurisdiction.

Finally, the defendants predict an explosion of creditors' litigation in New York. However, since *Starbare* was decided more than a decade ago, we have seen little evidence of actual conflict, or of the explosion of creditors' litigation predicted by the defendants.

CPLR 5225 (a) states, "[n]otice of the motion shall be served on the judgment debtor in the same manner as a summons or by registered or certified mail, return receipt requested."

■ The defendants contend that they were not properly served with the turnover motions. While they might not have been properly served with the amended motion, we find that they were properly served with the original motion. This constitutes adequate service given the fact that the original and amended motions are basically the same.

The plaintiffs sent the turnover motion to the defendants by registered mail, return receipt requested. A return receipt was received from Indah Kiat International. Thus, consistent with CPLR 5225 (a), the defendant was properly served. The registered mail envelope addressed to P.T. Indah Kiat was returned. However, it is clear that the defendant was avoiding service. For example, when the plaintiffs tried to serve P.T. Indah Kiat personally, an employee said his superior had told him to reject all attempts to serve court-related documents. Similarly, when the plaintiffs tried to serve the restraining notice on P.T. Indah Kiat by registered mail, return receipt requested, the notations on the envelope showed that the defendant had rejected the package.

A defendant may not frustrate service by failing to claim certified mail. (*See 232 Broadway Corp. v Calvert Ins. Co.*, 149 AD2d 694, 695 [1989]; *Rifenburg v Liffiton Homes*, 107 AD2d 1015, 1016 [1985] ["where a corporate defendant has received notice of certified mail in time to defend, it has effectively received notice of the summons contained in such mail"].) Furthermore, we note that since the defendants' counsel negotiated a briefing schedule, the defendants clearly had notice of the turnover motion.

In the indenture, the defendants agreed to accept service made on CT Corp. Although the defendants apparently terminated CT Corp. at some point before the plaintiffs served the turnover motion, the court below properly found that this termination was ineffective because the defendants neither gave prior written notice to the trustee that they were terminating CT Corp. nor appointed another agent for service of process in New York. (*See Recyclers Consulting Group, Inc. v IBM-Japan, Ltd.*, 1997 WL 615014, 1997 US Dist LEXIS 15356 [SD NY 1997].)

The plaintiffs personally served P.T. Indah Kiat in Indonesia and Indah Kiat International in the Netherlands. The defendants raise no issue with respect to service on Indah Kiat International. However, they contend that service on P.T. Indah Kiat by the plaintiffs' Indonesian counsel violated Indonesian law, which requires service by a bailiff in all cases. The plaintiffs submitted a dueling expert affidavit saying that a bailiff is required only in Indonesian lawsuits, and not foreign suits. However, we need not reach this issue given the adequacy of the service described above. Finally, we note that service was also effectuated through CPLR 311 (a) (1) and Business Corporation Law § 307.

The defendants contend that the plaintiffs did not show that they (the defendants) were "in possession or custody of . . . personal property in which [they had] an interest." The defendants are partly correct.

First, as our 2005 decision recognized, P.T. Indah Kiat possesses subsidiaries. However, the 2005 order directed both defendants to deliver stock certificates. The plaintiffs did not claim that Indah Kiat International owned any subsidiaries. Therefore, the order is modified to direct only P.T. Indah Kiat to turn over stock certificates.

The turnover *decision* of the court below states, "the Judgment Debtors are directed to either (1) pay the Judgment Creditors enough money to satisfy the Judgment in respect to the . . . Notes or (2) deliver to a designated sheriff stock certificates of equivalent value that, as of this date, are located outside of Indonesia." However, the turnover *order* is worded slightly differently:

> "*if* [the Judgment Debtors] do not pay the Judgment Creditors enough money to satisfy the Judgment in the amount of $68,179,703.97 in respect to

the . . . Notes, *then*, within thirty. . . days from service of notice of entry of this Order, they must deliver to a New York County sheriff, stock certificates of equivalent value that, as of May 23, 2005, were located outside of Indonesia" (emphasis added).

The plaintiffs contend that the order should have tracked the decision and directed the defendants to pay the judgment. The plaintiffs are correct and the discrepancy between the two constitutes error given the circumstances of the case.

While a party acting in good faith would read the order in conjunction with the decision and conclude that it should, in the first instance, pay $68 million, the defendants have apparently used the language of the order as an excuse to pay nothing. As for the part of the order directing delivery of stock certificates, the defendants conveniently "do not (and did not) own and possess any stock certificates that were located outside of Indonesia as of May 23, 2005 or at any time since then."

The clear language of CPLR 5225 (a) states, "the court shall order that the judgment debtor pay the money . . . to the judgment creditor." The IAS court apparently believed that it had ordered the defendants to pay money; when denying the plaintiffs' motion to hold the defendants in contempt, it held that, "the failure to pay a money judgment itself is not punishable as a contempt of court." This is not a finding that the original order did not require the defendants to pay money.

There appears to be no issue about whether the defendants are in possession of sufficient money. The plaintiff contends that P.T. Indah Kiat "is depositing $16.5 million per month in bank accounts used to repay the principal and interest of restructed debt" and further, that the judgment debtors have reported net profits of $17.44 million for the first half of 2005. The defendants did not deny these figures. Instead, they maintained that:

"Indah Kiat's MRA (Master Restructuring Agreement) imposes . . . tight restriction on Indah Kiat,
. . .

"the encumbering of much of Indah Kiat's property with liens and expressly restricting Indah Kiat's use of any revenues (and profits, if any) to uses permitted by the MRA and on the terms and condition specified in the MRA . . . Those MRA-imposed

obligations and restrictions preclude Indah Kiat from paying any of its revenues (or profits, if any) to Judgment Creditors."

However, there is no legal reason why the plaintiffs' judgment must be subordinate to the MRA (an *agreement* between defendants and their other creditors). Thus, the IAS court also should have ordered P.T. Indah Kiat to execute documents transferring ownership interests in its subsidiaries and affiliates.

■ CPLR 5225 (c) states, "The court may order any person to execute and deliver any document necessary to effect payment or delivery." In *Jack London Prods. v Bronston Prods.* (22 AD2d 870 [1964]) we held that the respondent judgment debtor "should . . . be required to execute appropriate instruments enabling the Sheriff to realize on respondent's right, title and interest in" various stocks. Whereas the defendants' statement about Indah Kiat International was straightforward (it "never has had an ownership interest in any other entity"), their statement about P.T. Indah Kiat was very careful:

"To the extent that Judgment Debtor Indah Kiat has or had an ownership interest in any other entity, no such ownership interest is or was represented or evidenced by any stock certificates that Indah Kiat owned and possessed in any location outside of Indonesia as of May 23, 2005 or at any time since then."

We recognize that this could mean that P.T. Indah Kiat possessed stock certificates, but such certificates were located in Indonesia. However, the defendants' statement could also be interpreted to mean that P.T. Indah Kiat's ownership is evidenced in some form other than stock certificates. If the latter is the case, P.T. Indah Kiat should be ordered to execute appropriate documents so as not to exalt form over substance.

The plaintiffs contend that the turnover order should have included certain specified mills located in Indonesia. This argument is unavailing. CPLR 5225 (a) refers to the delivery of "personal property" to the sheriff. Paper mills consist of huge buildings and heavy machinery that are affixed to the land and are immoveable. The mills clearly constitute real property rather than personal property. (*See People v Leiby*, 184 Misc 21, 23 [Utica City Ct 1945] ["real property" includes buildings].)

The plaintiffs also contend that the turnover order should have included the collateral secured by the indenture. This argu-

ment is also unavailing. The collateral secured by the indenture is governed by separate security documents. If the plaintiffs want to reach that collateral, they must comply with the terms of the relevant documents.

However, the turnover order properly should have included bank accounts. The IAS court and the defendants rely on *Matter of Delaney* (256 NY 315 [1931]). However, that case was interpreting a provision of the Civil Practice Act, narrower than its subsequently enacted CPLR counterparts. In *Delaney*, the Court of Appeals stated, "The money deposited with the bank belongs to the bank and is not the property of the depositor. The property of the depositor is the indebtedness of the bank to it." (*Id.* at 319.) The Court noted that "the delivery of tangible personal property may be compelled" under Civil Practice Act § 792, and that the bank's indebtedness to its depositor was not tangible. (*Id.* at 319, 321.) However, CPLR 5225 is not limited to tangible personal property; rather, it applies to "money or other personal property" in which the judgment debtor has an interest. For example, in *In re Gaming Lottery Sec. Litig.* (2001 WL 123807, 2001 US Dist LEXIS 1204 [SD NY 2001]), the court issued a turnover order directing the judgment debtor to pay the judgment creditor from its (the debtor's) Royal Bank of Scotland account. (*See Miller v Doniger*, 28 AD3d at 405; *see also* Weinstein-Korn-Miller, NY Civ Prac ¶ 5225.21 ["The court . . . may use CPLR 5225 (c) to order the debtor to execute and deliver a withdrawal slip so that his bank account in this or in another state may be reached"].)

To the extent that *Delaney* emphasized the difference between "debt" or "property" (256 NY at 321), it has been superseded. (*See ABKCO Indus., supra*; *see also Alliance Bond Fund, Inc. v Grupo Mexicano De Desarrollo, S.A.*, 190 F3d 16, 23 [2d Cir 1999] ["*ABKCO* virtually erases the distinction in (CPLR) 5201 between 'debt' and 'property' "].) Thus, the accounts described in Appendix part A should have been included in the turnover order.

Finally, the turnover order should have included the defendants' property in Indonesia. The defendants submitted evidence that Indonesian courts have enjoined the plaintiffs "from prosecuting any enforcement or payment lawsuit or proceeding relating to the [indenture and notes] or taking any step with respect thereto." That is different from saying that the defendants would violate an Indonesian court order if they satisfied the existing New York judgment.

Even if the defendants were found to be in violation of an Indonesian court order, they clearly are the engine of their own misfortune. After the IAS court granted summary judgment against them, they started a competing lawsuit in Indonesia. While a state (e.g., New York) may not require a person to do an act in another state (e.g., Indonesia) that is prohibited by the law of that state, orders of foreign courts are not entitled to comity if the litigants who procure them have "deliberately courted legal impediments" to the enforcement of a federal court's orders. (*Motorola Credit Corp. v Uzan*, 388 F3d 39, 60 [2d Cir 2004], *cert denied* 544 US 1044 [2005] [internal quotation marks and citations omitted].)

The defendants claim that the IAS court decided that the above standard had not been met. However, that decision was rendered in another context: the IAS court was denying the plaintiffs' motion to enjoin the defendants from prosecuting the Indonesian lawsuit. Even if the IAS court found that the defendants were not acting in bad faith, the ruling is not binding on this Court. We find that the defendants clearly are engaging in conduct evincing bad faith; they challenged a standard and legitimate indenture that is governed by New York law and managed to procure an Indonesian court order declaring the indenture invalid on the ground that it violated Indonesian law.

The defendants cite three cases for the proposition that "United States courts uniformly have recognized the legitimacy of Indonesia's judicial system." However, two of those cases *PT United Can Co. Ltd. v Crown Cork & Seal Co., Inc.* (138 F3d 65 [2d Cir 1998]) and *Zipfel v Halliburton Co.* (832 F2d 1477 [9th Cir 1987], *cert denied* 486 US 1054 [1988], *amended on other grounds* 861 F2d 565 [9th Cir 1988]) were forum non conveniens cases. In a forum non conveniens analysis, an alternative forum is considered "adequate" if the defendant is amenable to process in that jurisdiction and the alternative forum permits litigation of the subject matter of the dispute. (*See e.g. Piper Aircraft Co. v Reyno*, 454 US 235, 254 n 22 [1981].) That is different from the standard for recognition of a foreign judgment. (*See e.g.*, CPLR 5304 [grounds for nonrecognition of a foreign money judgment].)

The defendants' third case, *In re Arbitration Between Karaha Bodas Co. L.L.C. v Perusahaan Pertambangan Minyak Dan Gas Bumi Negara* (2004 WL 2712556, 2004 US Dist LEXIS 23870 [SD NY 2004]), merely stated that Indonesian accounting principles and Indonesian law about corporate separateness

were the same as in the rest of the civilized world and that, if an Indonesian defendant refused to pay its supplier, the supplier could sue in Indonesia.

The plaintiffs submitted extensive materials casting doubt on the Indonesian legal system. For example, the United States State Department Report on Human Rights Practices for 2003 in Indonesia says that the Indonesian judiciary "was often influenced by . . . business interests,"[2] that Indonesian judges "were subject to pressure from governmental authorities, which often influenced the outcome of cases" and that "[w]idespread corruption continued throughout the legal system. . . . Bribes influenced prosecution, conviction, and sentencing in countless civil and criminal cases." (*See also In re Perry H. Koplik & Sons, Inc.*, 357 BR 231 [SD NY 2006].) The United Nations Online Network in Public Administration and Finance has stated, "Indonesia's legal system is notoriously corrupt . . . The courts do not function in a timely and effective manner, nor do they carry out justice with due process." (Countries at the Crossroads: Country Profile of Indonesia.) The International Commission of Jurists also has noted the corruption in Indonesian courts.

The IAS court should not have vacated the injunction prohibiting the defendants from transferring assets into Indonesia. The IAS court had the power to issue the injunction, even though it related to extraterritorial conduct, because it had jurisdiction over the defendants. (*See Abuhamda v Abuhamda*, 236 AD2d 290 [1977] [affirming injunction directing bank, which engaged in business in New York, not to pay out funds from an account in Jordan].)

The injunction was clearly necessary to protect the court's order. The turnover order applied only to stock certificates located outside Indonesia, so the defendants could easily have rendered it nugatory by moving the certificates into Indonesia. (*See Indosuez Intl. Fin. v National Reserve Bank*, 304 AD2d 429, 430-431 [2003] ["once there was a New York judgment on the merits, the courts of this State were entitled to protect it"]; *see also Cold Spring Light, Heat & Power Co. v Selleck*, 256 NY 451, 456 [1931] ["(c)ourts of equity undoubtedly have power to make such orders as may be necessary to carry out and give effect to their decrees"].)

---

**2.** We note that P.T. Indah Kiat is "the largest pulp and paper company in Indonesia."

The IAS court considered the injunction to be "problematic" because "the plaintiffs did not apply for this broad injunctive relief." However, courts are permitted to issue injunctions sua sponte. (*See e.g., Melnitzky v Apple Bank for Sav.*, 19 AD3d 252, 253 [2005]; *cf. Chang v SDI Intl. Inc.*, 15 AD3d 518, 519 [2005].)

The IAS court also stated that "New York courts cannot restrain transfers of property located outside of the state." However, the case on which it relied, *Matter of National Union Fire Ins. Co. of Pittsburgh, Pa. v Advanced Empl. Concepts* (269 AD2d 101 [2000]), does not stand for that proposition. Rather, in *National Union* we held that "the court was without authority to *attach* bank accounts outside of New York . . . . In order to be subject to *attachment*, property must be within the court's jurisdiction." (*Id.* [emphasis added].) Moreover, this Court's decision in *Abuhamda* (236 AD2d at 290) demonstrates that a New York court *can* restrain transfers of property outside the state, so long as it has jurisdiction over the transferor.

Accordingly, the order of the Supreme Court, New York County (Helen E. Freedman, J.), entered August 23, 2005, insofar as it vacated the restraining notices that plaintiffs served on defendants Indah Kiat International Finance Company B.V. and P.T. Indah Kiat Pulp & Paper Corporation and failed to order defendants to turn over certain property, should be modified, on the law and the facts, to direct defendants to pay plaintiffs sufficient funds to satisfy the judgment; and to direct P.T. Indah Kiat to turn over stock certificates wherever located, execute appropriate documents transferring ownership of its subsidiaries to plaintiffs if such ownership is evidenced in some form other than stock certificates, and turn over the bank accounts listed in part A of the Appendix, and otherwise affirmed, with costs in favor of plaintiffs payable by defendants-respondents-appellants. Order, same court and Justice, entered on or about March 16, 2006, insofar as it vacated the portion of the 2005 order which had enjoined defendants from transferring their assets into Indonesia, should be reversed, on the law, with costs, and the injunction against transferring assets into Indonesia reinstated.

MAZZARELLI, J.P., FRIEDMAN, GONZALEZ and MALONE, JJ., concur.

Order, Supreme Court, New York County, entered August 23, 2005, modified, on the law and the facts, to direct defendants to

pay plaintiffs sufficient funds to satisfy the judgment; and to direct P.T. Indah Kiat to turn over stock certificates, execute appropriate documents transferring ownership of its subsidiaries to plaintiffs if such ownership is evidenced in some form other than stock certificates, and turn over certain bank accounts; and otherwise affirmed, with costs in favor of plaintiffs payable by defendants-respondents-appellants. Order, same court, entered on or about March 16, 2006, reversed, on the law, with costs, and the injunction against transferring assets into Indonesia reinstated.